# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL RENARD,<br><br>                Plaintiff,<br>vs.<br><br>SAN DIEGO UNIFIED PORT DISTRICT, ET AL.,<br><br>                Defendants. | CASE NO. 06-CV-2665 H (BLM)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION** |

On December 14, 2006, Plaintiff Daniel Renard, appearing pro se, filed his first amended complaint ("FAC") against the San Diego Unified Port District, the Port District Board of Commissioners, individual members of the Board of Commissioners,[1] the San Diego Harbor Police, individual members of the Harbor Police,[2] and Does 1-10. (Doc. No. 2.) On January 5, 2007, Plaintiff filed a motion for a temporary restraining

---

[1] Plaintiff names the following individual commissioners as Defendants in the caption of the FAC: Robert J. (Rocky) Splane, Sylvia C. Rios, Michael B. Bixler, Stephen P. Cushman, Mike Najera, Robert "Dukie" Valderrama, and Bruce B. Hollingsworth. Additionally, Plaintiff references Victor A. Vilaplana as an individual Defendant in the text of the first amended complaint, (see FAC ¶ 7), but Plaintiff did not name Mr. Vilaplana in the caption and has not filed a return of service as to him.

[2] Plaintiff names the following individual officers as Defendants in the caption of the FAC: Chief Kirk M. Sanfilippo, Kim Fives, Officer Miles, Bay Control Officer Sergeant Micsclhtllis, Officer Tosada, and Sergeant Leeson. In the text of the FAC, however, Plaintiff only specifically references Officer Miles, Sergeant Miscslhtllis, Officer Tosada, and Officer Fives. (See FAC ¶¶ 23, 29, & 30.)

order ("TRO") and injunction seeking to prevent seizure of property by Defendants San Diego Unified Port District and San Diego Harbor Police (collectively, "Defendants"). (Doc. No. 6.) Defendants filed a response in opposition on January 9, 2007. (Doc. No. 44.) The Court heard oral argument on January 12, 2007. Plaintiff appeared pro se, and William D. McMinn appeared for Defendants. Following oral argument, Defendants submitted supplemental documents on January 19, 2007 and January 23, 2007. (Doc. Nos. 49 & 50.) Plaintiff filed supplemental documents on January 25, 2007 and on January 29, 2007. (Doc. Nos. 51 & 53.) For the reasons set forth below, the Court DENIES Plaintiff's motion.

## **Background**

In the FAC, Plaintiff claims that he is an owner and operator of vessels in the United States. (FAC ¶ 5.) Plaintiff alleges that he has a permit for the A-9 Anchorage in San Diego Bay and that he lives there. (Id. ¶ 16.) At oral argument, Plaintiff presented a property tax bill and receipt related to his boat, and he presented a homestead declaration as to his vessel. (TRO Hr'g, Pl.'s Exs. 8-10.)

In the FAC, Plaintiff complains of several actions taken by Defendants. First, Plaintiff asserts that the Board of Commissioners' actions in regulating various anchorages violate federal law. (FAC ¶¶ 15, 20.) Plaintiff contends that federal law preempts some of the local regulations. (Id. ¶ 22.) Further, he asserts that certain regulations violate Article 10, Section 4 of the California Constitution. Next, Plaintiff asserts that the San Diego Unified Port District ("Port District") and its officers have violated various federal and state laws in ticketing him without cause. (Id. ¶ 23.)

Plaintiff also claims that, following his initiation of a lawsuit in 2003, he entered into a settlement with the Port District, its commissioners, and employees in December of 2003. (Id. ¶ 27.) In the agreement, the Port District provided him with a disabled permit for the Port's A-9 Anchorage, and in return he agreed to dismiss the suit and to comply with applicable laws. (Id., Ex. 10 at 5.) Plaintiff alleges that, on June 6, 2006, the Port District commissioners voted to eliminate the A-9 Anchorage accommodation

for disabled boaters. (Id. ¶ 26.) According to Plaintiff, on or about July 12, 2006, a notice was placed on his vessel indicating that the vessel would be seized if it was not relocated from its anchorage within 72 hours. (Id. ¶ 28.) He asserts that the permitting program violates the United States Constitution. (Id. ¶ 29.)

Plaintiff states that he received a letter on August 12, 2006 from the Chief of the San Diego Harbor Police ("SDHP") noting that the Port District's commissioners had voted to eliminate free, unlimited anchoring in the A-8 Anchorage. (Id. ¶ 30, Ex. 10 at 9.) The letter also states that, because the A-9 Anchorage was designated as an alternative anchoring site for persons with disabilities who were unable to use A-8, and because qualified disabled owners using A-9 are required to meet all the requirements set forth in the A-8 Anchorage ordinance in order to obtain an A-9 permit, the changes to the A-8 ordinance will also affect the A-8 disabled permit holders. (Id.) In response, Plaintiff sent a letter stating that he wanted to remain in the A-9 Anchorage, and that the changes proposed in the letter would violate the December 2003 settlement agreement. (Id. ¶ 30, Ex. 10 at 10.) He received a response from the SDHP indicating that Plaintiff's A-9 disabled anchorage permit requires him to comply with all requirements in the A-8 Anchorage ordinance. (Id. ¶ 30, Ex. 10 at 11.) The letter indicates that, when the free, long term A-8 Anchorage was eliminated, the A-9 Disabled Anchorage was also eliminated. (Id.) Further, the letter indicates that A-9 Disabled Anchorage permittees could join any A-8 Anchorage permittees who wish and are eligible to obtain, for a monthly fee, a mooring ball in an existing mooring field in San Diego Bay. (Id.) The letter also states that Plaintiff's settlement did not entitle him to permanent, free, long term anchoring in the A-9 Anchorage. Rather, the obligation to accommodate him arose from the existence of the A-8 Anchorage program. (Id., Ex. 10 at 12.) Accordingly, the letter states that, when the A-8 Anchorage is eliminated, there will no longer be any free, long term anchoring in the bay, and the A-9 Disabled Anchorage will revert to its prior use. (Id.)

////

Plaintiff's complaint lists the following seven claims: (1) unlawful rulemaking based on preemption; (2) unlawful seizure in violation of Article 1, section 13 of the California Constitution; (3) 42 U.S.C. § 1983 claim based on violations of the Fourth and Fifth Amendments; (4) violation of 42 U.S.C. § 1985; (5) unlawful retaliation or coercion based on disability; (6) breach of contract and fraud; (7) negligence in violation of 42 U.S.C. § 1986.

In his motion and supplemental documents, Plaintiff asserts that the San Diego Harbor Police (SDHP) routinely impounds vessels anchored in San Diego bay without due process. According to Plaintiff, the SDHP does not cite the owners or notify them in advance before impounding vessels. Further, Plaintiff claims that many people live aboard these vessels and that the seizures violate the Fourth Amendment. Plaintiff contends that these vessels are anchored in special anchorage areas over which the United States retains navigational control. Thus, he argues that federal law preempts local regulation. According to Plaintiff's motion, after the SDHP seizes a vessel, if a person pays the fees and retrieves the vessel, the vessel will be seized again as soon as the owner stops in San Diego Bay. Plaintiff claims that this system is designed to defeat his Ninth Amendment rights. Accordingly, Plaintiff seeks an injunction to prevent Defendants from seizing or destroying anyone's vessel.

### **Legal Standards**

Federal Rule of Civil Procedure 65(b) provides that a court may enter a TRO only if "immediate and irreparable injury, loss, or damage will result to the applicant." A TRO is a form of preliminary injunctive relief whose sole purpose is to preserve the status quo pending a hearing on the moving party's application for a preliminary injunction. See, e.g., Schwarzer, et al., Cal. Prac. Guide: Fed. Civ. P. Before Trial, ¶ 13:7 (The Rutter Group 2006) (citing Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 439 (1974)). A preliminary injunction is a device for preserving the status quo and preventing the irreparable loss of rights before a judgment in the suit. See Textile Unlimited, Inc. v. ABMH and Co., Inc., 240

F.3d 781, 786 (9th Cir. 2001). The same standard governs the issuance of both TROs and preliminary injunctions. See, e.g., Cal. Indep. Sys. Operator Corp. v. Reliant Energy Servs., Inc., 181 F. Supp. 2d 1111, 1126 (E.D. Cal. 2001) ("The standard for issuing a preliminary injunction is the same as the standard for issuing a temporary restraining order .").

A plaintiff can demonstrate that he is entitled to a TRO or preliminary injunction in one of two ways. First, using the "traditional criteria," a plaintiff must demonstrate: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). See Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1158 (9th Cir. 2006). Alternatively, a plaintiff may show "either a combination of probable success on the merits and the possibility of irreparable harm or that serious questions are raised and the balance of hardships tips sharply in his favor." Id. (internal quotations and emphases omitted). "This analysis creates a continuum: the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003). Even if the balance of hardships tips decidedly in favor of the moving party, however, the movant must show at least a fair chance of success on the merits. See Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995).

## Analysis

**A.     Likelihood of Success on the Merits**

A plaintiff must demonstrate a likelihood of success on the merits to obtain preliminary injunctive relief. Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 666 (2004). As noted above, even if the balance of harm clearly weighs in the movant's favor, at "an 'irreducible minimum,' the moving party must demonstrate a fair chance

////

of success on the merits, or questions serious enough to require litigation." <u>Arcamuzi v. Continental Air Lines, Inc.</u>, 819 F.2d 935, 937 (9th Cir. 1987).

In support of his motion, Plaintiff cites to federal statutes, regulations, and a Supreme Court decision, and argues that these authorities demonstrate a likelihood of success on the merits.[3] First, he cites to 43 U.S.C. § 1314, which states that the United States retains navigational servitude and the right to control certain lands and navigable waters, but "shall not be deemed to include, proprietary rights of ownership, or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and vested in and assigned to the respective States." Next, he cites to 33 U.S.C. § 471, which authorizes the Secretary of Homeland Security to establish, under certain conditions, anchorage grounds for vessels in certain navigable waters of the United States. Further, he cites to 14 U.S.C § 91, which provides that the Secretary of Homeland Security "may control the anchorage and movement of any vessel in the navigable waters of the United States to ensure the safety or security of any United States naval vessel in those waters." He also cites to a portion of a decree entered by the Supreme Court regarding control over coastal lands and waters of California:

> Subject to [certain reservations], California is entitled, as against the United States, to the title to and ownership of the tidelands along its coast (defined as the shore of the mainland and of islands, between the line of mean high water and the line of mean lower low water) and the submerged lands, minerals, other natural resources and improvements underlying the inland waters and the waters of the Pacific Ocean within three geographical miles seaward from the coast line and bounded on the north and south by the northern and southern boundaries of the State of California, including the right and power to manage, administer, lease, develop and use the said lands and natural resources all in accordance with applicable State law. The United States is not entitled, as against the State of California, to any right, title or interest in or to said lands, improvements and natural resources except as provided by s 5 of the Submerged Lands Act.

<u>United States v. California</u>, 382 U.S. 448, 452, 453 (1966) (per curiam). Finally, he

---

[3] As requested by Plaintiff, the Court takes judicial notice of these statutes, regulations, and court decisions.

1  cites to a federal regulation regarding the Coast Guard's establishment of several special
2  anchorage areas in San Diego Bay, 33 C.F.R. § 110.90, and he points out that an
3  accompanying regulatory evaluation states that the rule will not impose a cost on vessel
4  operators and will provide more options to vessels desiring to anchor in San Diego Bay.
5  63 Fed. Reg. 16688-89 (April 6, 1998).  Through these citations, Plaintiff contends that
6  federal law preempts local regulation of the waters in San Diego Bay.

In opposition, Defendants argue that state and local laws regulate anchorage in San Diego Bay.  Further, Defendants argue that federal law does not preempt local regulation of San Diego Bay.

**1.  Authority of Port District to Regulate Anchorage in San Diego Bay**

As the California courts have explained, the "State of California holds title to the navigable waterways and the land beneath them within its borders as trustee for the public."  Graf v. San Diego Unified Port Dist., 7 Cal. App. 4th 1224, 1228 (1992) (citing Colberg, Inc. v. California, 67 Cal. 2d 408, 416 (1967)).  This public trust also includes tidelands.  Id.  "The state's power to control, regulate and utilize the navigable waterways within terms of the trust is absolute except as limited by the supervisory power of the federal government."  Id. at 1228-29 (citing Colberg, Inc., 67 Cal. 2d at 416).  The state may delegate the power to manage and control to local agencies.  Id. at 1229 (citing City of Long Beach v. Lisenby, 175 Cal. 575, 579 (1917)).

The San Diego Unified Port District Act ("Port Act"),[4] constitutes the enabling legislation for the Port District.  See Cal. Harb. & Nav. Code App. 1 § 1 et seq. (West 2006).  Thus, through the Port Act, the state of California has "delegated its authority to manage and control San Diego Bay to [the] Port District."  Graf, 7 Cal. App. 4th at 1229.  As stated in the Port Act, the Port District was formed because several cities and unincorporated populated areas surround San Diego Bay, and "only a specially created district can operate effectively in developing the harbors and port facilities." Cal. Harb. & Nav. Code App. 1 § 2.  Accordingly, the Port Act required that each member city

---

[4] As requested by Defendants, the Court takes judicial notice of the Port Act.

convey to the Port District "all its right, title and interest in and to the tidelands and submerged lands . . . including any such lands which have been granted in trust to the city by the State in the Bay of San Diego." Id. § 14. "Thereafter the title to such lands shall reside in the district, and the district shall hold such lands in trust for the uses and purposes and upon the conditions which are declared in this act." Id. The Port District is governed by a board of commissioners appointed by the cities within the district. Id. § 16.

The Port Act states that the Port District was formed "for the development, operation, maintenance, control, regulation, and management of the harbor of San Diego upon the tidelands and lands lying under the inland navigable waters of San Diego Bay." Id. § 4(a). Section 55 of the Port Act sets forth some of the regulatory duties of the Port District's board:

> The board shall:
> (a) Make and enforce all necessary rules and regulations governing the use and control of all navigable waters and all tidelands and submerged lands, filled or unfilled, and other lands within the territorial limits of the district.
> (b) Regulate and control the anchoring, mooring, towing and docking of all vessels.
> (c) Establish and maintain a system of harbor police . . . for the enforcement of the ordinances, rules and regulations of the district . . . .

Id. § 55. Pursuant to the Port Act, the Port District has adopted ordinances regulating marine operations. See San Diego Unified Port District Code § 4.01 et seq.

Several code sections regulate anchoring in San Diego Bay. Section 4.36 regulates the A-8 Anchorage, also known as the Sweetwater Anchorage. In the past, this anchorage has allowed free, unlimited anchoring with a permit. The section was recently amended, however, and it now states that the Port District "shall discontinue issuing Permits to anchor in the A-8 Anchorage, except for the purpose of re-issuing Permits to Vessels with current, valid Permits and meeting all the requirements and conditions of this Section. The [Port] District may require relocation of any Vessel within the Anchorage to another Anchorage within the Bay for the purpose of reconfiguration or elimination of the existing Anchorage." Id. § 4.36(c)(11). Further, recent amendment of this section requires each permit applicant to "provide a security

deposit in the amount of Two Thousand Five Hundred Dollars ($2,500.00)." Id. § 4.36(c)(9).

Section 4.38 regulates anchoring in the A-9 Anchorage, or Cruisers Anchorage. Although generally for use by out of county vessels, the A-9 Anchorage is also available by permit to disabled boaters who cannot use the A-8 anchorage because of their disabilities. Id. § 4.38(h)(4)(d). Disabled boaters may be eligible for a six month permit in this anchorage, and they may renew the permit "as long as the vessel meets the requirements to obtain an Anchoring Permit in the A-8 Anchorage as described in Section 4.36." Id. As noted above, the Port District commissioners voted at their June 6, 2006 meeting to eliminate the A-8 Anchorage as a free, unlimited anchorage. (See Defs.' Opp. Pl.'s Mot. TRO or Inj., Ex.F (June 6, 2006 Port District Board of Commissioners Meeting Minutes).) Subsequently, the commissioners adopted amendments to the code provisions governing the A-8 Anchorage. The Port District is evaluating options to provide mooring balls, for a charge, to boaters in the A-8 and A-9 Anchorages who desire them. (Id.) Finally, § 8.25 provides that "the Executive Director or any harbor police officer is hereby authorized to remove and impound any vessel, watercraft or object found in violation of any Federal or State law or provision of this code in accordance with the procedures set forth in this Section."

In the face of legal challenges, California courts have recognized the authority and power of the Port District to regulate anchoring in San Diego Bay. In Graf, for example, the Court held that the Port District "acted within its jurisdiction in regulating the mooring and anchoring activities on the navigable waters held by [the] Port District and by the state within the territorial limits of the district." Graf, 7 Cal. App. 4th at 1231. Further, in addressing a challenge to Port District ordinances under the California Constitution, the court stated, "[b]oaters do not have a constitutional right to unregulated long-term anchorage in public navigable waters." Graf, 7 Cal. App. 4th at 1232. Thus, state law allows regulation of anchoring and mooring by the Port District.

### 2. Preemption

As noted above, Plaintiff argues that federal law preempts Defendants from regulating vessels in San Diego Bay. "[W]hen a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" Beveridge v. Lewis, 939 F.2d 859, 862 (9th Cir. 1991) (quoting Ray v. Atlantic Richfield Co., 435 U.S. 151, 157 (1978)). Preemption can occur in three ways. First, preemption occurs if "Congress has expressly stated that federal law preempts state or local law on a particular topic." Id. at 862 n.1. Second, states are preempted where Congress has implicitly occupied a field either through pervasive regulations leaving no room for states to supplement "or through the federally sensitive nature of the particular subject area (e.g., foreign affairs)." Id. at 862. Third, preemption occurs if a state law actually conflicts with federal law. Id.

Congress has not expressly stated that anchorage and mooring are preempted by federal law. Looking at whether Congress has implicitly preempted state regulation of this area, the Ninth Circuit has held that anchorage and mooring are not federally sensitive areas. Barber v. Hawai'i, 42 F.3d 1185, 1194 (9th Cir. 1994). Moreover, the Ninth Circuit has found that the federal government has not so pervasively regulated in the area so as to implicitly leave no room for state regulation. See id. at 1190, 1193. As the court stated, "[f]ederal laws and regulations have not occupied the field of anchorage and mooring." Id. at 1193; see also Beveridge, 939 F.2d at 864 ("[T]here is no reason to believe that Congress intended to occupy the field in the area of mooring . . . ."). Rather, the Ninth Circuit noted "the Supreme Court's longstanding recognition that anchorage and mooring rules are best left to the states in the absence of compelling government interests to the contrary." Barber, 42 F.3d at 1193.

Additionally, the statutes and regulations to which Plaintiff cites do not indicate congressional intent to preempt state action. In Barber, the court specifically found that

Congress' express reservation of its navigational servitude in the Submerged Lands Act, 43 U.S.C. §§ 1311 et seq., did not indicate an intent to preempt state regulation. Barber, 42 F.3d at 1192. Similarly, the court found that Congress' direction in 33 U.S.C. § 471 that the Secretary of Transportation establish anchorage grounds for vessels in all harbors did not indicate an intent that such regulation was to be exclusive. Barber, 42 F.3d at 1192. Further, although Plaintiff cites to 33 C.F.R § 110.90 in support of his preemption argument, that regulation specifically contemplates joint regulation by the Coast Guard and the Port District, as it directs "mariners anchoring in San Diego Harbor [to] consult applicable local ordinances of the San Diego Unified Port District." Finally, 14 U.S.C. § 91 simply states that the Secretary of Homeland Security has a general power to regulate the movement and anchorage of a vessel to ensure safety of naval vessels. Thus, this provision does not indicate an intent to wholly occupy the field of mooring and anchoring.

Along the same lines, the statutes and regulations to which Plaintiff cites do not demonstrate an actual conflict with the Port District's regulations. While one regulation mentions San Diego Bay, that regulation expressly contemplates regulation of San Diego Bay by the Port District. As noted, 33 C.F.R. § 110.90 directs mariners to consult with Port District ordinances regarding anchoring in San Diego Harbor. Similarly, the Coast Guard included the following discussion of proposed regulations, which were later adopted, regarding the role of the Port District in regulating San Diego Bay:

> The justification for some of the proposed anchorages contained in the [Port District's] plan (A-4, A-6, A-7, & A-8) is primarily based on important state and local land use and aesthetic concerns. These factors go beyond the Coast Guard's statutory authority for regulating navigation and it is inappropriate at this time that they be established as federal anchorages.

51 Fed. Reg. 8687 (March 13, 1986) (concerning proposed amendments to 33 C.F.R. §§ 110.90 and 110.210). Likewise, as Plaintiff highlights, 33 C.F.R. § 110.210 also contemplates administration by the Port District. See 33 C.F.R. § 110.210(b)(2)

(administration of a particular anchorage "is exercised by the Port Director, San Diego Unified Port District"). Thus, Plaintiff has not demonstrated that federal law actually conflicts with the Port District's ordinances.

Plaintiff has not demonstrated a likelihood of success on his claim that federal law preempts local regulation of anchoring and mooring in San Diego Bay.

### 3. Ninth Amendment

Plaintiff also states that seizure of vessels by the SDHP violates the Ninth Amendment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. "[T]he Ninth Amendment 'has not been interpreted as independently securing any constitutional rights for purposes of making out a constitutional violation.'" San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1125 (9th Cir. 1996) (quoting Schowengerdt v. United States, 944 F.2d 483, 490 (9th Cir. 1991), cert. denied, 503 U.S. 951 (1992)); see also Strandberg v. City of Helena, 791 F.2d 744, 748-49 (9th Cir. 1986) ("[T]he ninth amendment has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim."); Kurt T. Lash, The Lost Original Meaning of the Ninth Amendment, 83 Tex. L.R. 331, 340 (2004) (Ninth Amendment is concerned with constitutional interpretation and is not a grant of power or source of rights) (citing Laurence H. Tribe, American Constitutional Law 776 n.14 (2d ed. 1988) ("It is a common error, but an error nonetheless, to talk of 'ninth amendment rights.' The ninth amendment is not a source of rights as such; it is simply a rule about how to read the Constitution.")). Accordingly, because the Ninth Amendment is not an independent source of rights, Plaintiff has not demonstrated a likelihood of success on this argument.

### 4. Fourth Amendment

Finally, Plaintiff states in his motion that seizures of boats by the SDHP violate the Fourth Amendment. The Fourth Amendment applies to the states through the Fourteenth Amendment. See, e.g., Miranda v. City of Cornelius, 429 U.S. 858, 864 (9th

Cir. 2005). A seizure of property occurs when there is some meaningful interference with an individual's possessory interests in the property. <u>Soldal v. Cook County, Illinios</u>, 506 U.S. 56, 61 (1992) (citation and quotation omitted). As part of law enforcement's community caretaking function, however, vehicles are routinely taken into police custody. <u>South Dakota v. Opperman</u>, 428 U.S. 364, 368-69 (1976). "[T]he decision to impound pursuant to the authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment, as applied to the states by the Fourteenth Amendment." <u>Miranda,</u> 429 U.S. at 864. In the context of vehicles, the Ninth Circuit has stated that the relevant question is whether the decision to impound the vehicle was reasonable under the Fourth Amendment. <u>Id.</u> at 865. For example, "the violation of a traffic regulation justifies impoundment of a vehicle if the driver is unable to remove the vehicle from a public location without continuing its illegal operation." <u>Id.</u>

Plaintiff's motion does not state that his vessel has been impounded, and he does not detail the circumstances of any seizures. Accordingly, he has not established a likelihood of success on a violation of the Fourth Amendment. Additionally, the Court notes that the privacy expectations of a boat owner, even a houseboat owner, are limited. <u>See, e.g.</u>, <u>United States v. Albers</u>, 136 F.3d 670, 673 (9th Cir. 1998) (houseboat carried reduced expectation of privacy because it was mobile, it was in open public waters, and it could be stopped and boarded at any time by officials to inspect for compliance with safety, equipment, and operation regulations).

In sum, Plaintiff has not demonstrated a likelihood of success on the merits of any of his arguments.

**B.    Irreparable Harm**

A court may only enter preliminary injunctive relief when the movant has shown "a significant threat of irreparable injury." <u>Simula, Inc. v. Autoliv, Inc.</u>, 175 F.3d 716, 725 (1999). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against

1 a claim of irreparable harm." Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football
2 League, 634 F.2d 1197, 1202 (9th Cir. 1980) (internal citations omitted). The party
3 seeking preliminary injunctive relief must show a danger of immediate harm, as "a
4 showing of irreparable harm is insufficient if the harm will occur only in the indefinite
5 future." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3rd Cir. 1992); see also
6 Midgett v. Tri-County Metro. Transp. Dist. of Oregon, 254 F.3d 846, 850-51 (9th Cir.
7 2001); Schwarzer, et al., Cal. Prac. Guide: Fed. Civ. P. Before Trial ¶ 13:55.1 (The
8 Rutter Group 2006). The tests of irreparable injury and meritoriousness are not distinct,
9 but rather a strong showing of one may compensate for a lesser showing of the other.
10 Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987).

11 In his motion, Plaintiff has not shown that he will suffer immediate irreparable
12 harm absent preliminary injunctive relief. As Defendants point out, he does not allege
13 that his vessel has been impounded, that he has been arrested, or that he is threatened
14 with immediate harm. Rather, he states in general terms that the SDHP routinely
15 impounds vessels and that persons will suffer irreparable harm absent an injunction.
16 Moreover, although the Port District board voted to eliminate free, long term anchoring
17 in the A-8 Anchorage, the adopted code amendments allow current permittees to remain
18 and apply for new permits every six months. Similarly, the amendments do not alter
19 the current use of the A-9 Anchorage as a reasonable accommodation for those
20 permittees unable to use A-8 because of disabilities. While the code amendments allow
21 the Port District to relocate vessels for the purpose of reconfiguration or elimination of
22 the Anchorage, Plaintiff has not demonstrated that he will suffer immediate irreparable
23 harm, but rather that he may suffer harm at some indeterminate point in the future if
24 asked to relocate. Accordingly, Plaintiff has not shown that he will suffer irreparable
25 harm absent preliminary injunctive relief.
26 / / / /
27 / / / /
28 / / / /

**Conclusion**

For the reasons set forth above, Plaintiff has not shown a likelihood of success on the merits or that he will suffer irreparable injury absent preliminary injunctive relief. Accordingly, the Court **DENIES** Plaintiff's motion for a TRO and injunction.

IT IS SO ORDERED.

DATED: February 1, 2007

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

Copies To:

Daniel Renard, pro se
P.O. Box 6301
San Diego, CA 92166

Ellen Miles, Esq.
William McMinn, Esq.
Unified Port of San Diego
PO Box 120488
San Diego, CA 92112-0488